Morning, Your Honors. Morning. Morning, Counsel. Mike Bresnan, representing William Fuller. I'd like to move through the five issues in the order in which I presented them in the brief, unless the Court would like me to do otherwise. First issue is the Miranda issue. In this case, I'll jump right to the criteria used by the Judge Magistrate initially in making the determination. It would be helpful to contrast this case with Bassignani. I assume you're aware of Bassignani. Yes, I am, Your Honor. I had prepared to — I was going to go ahead and compare with Craighead. Well, that's fine. That's fine. Bassignani happens to be another case in the same genre. Okay. Yeah, Bassignani, defendant interviewed — was interviewed in the workplace. As was this one, except it was in the police car, right? Right. And that would be our argument or the defendant's argument for there being a distinction between the two cases. Apparently, in Bassignani, the workplace was open. People were free to come and go into and out of the area where the conversations were — or the interrogation was taking place, whereas in this case, the interrogation took place in a closed, we would argue, locked vehicle. Is it your position that any one of the five factors discussed in Bassignani, if it turns out that would favor a finding of custody, is enough to — for us to require that the district court made a finding of custody, or is it one of five elements? How do we deal with the five elements? It's probably the latter. It's probably the totality of the circumstances. I think the factors set forth, for example, in Butler, U.S. v. Butler and U.S. v. Kim, are factors that were designed to address the totality of the circumstances. Craighead factors were similar, although a little different. And I think there were four factors set forth in Craighead. I think they're a little different because I think the facts in each case caused these analyses to morph a little bit. I think that you've got a good point in saying that the location of the interrogation is more custodial here than it was in Bassignani. But what about the other four factors, the language used to summon the defendant to the interview, the confrontation with evidence of guilt, the duration of the detention, or the pressure used to detain? How would you compare those to Bassignani, in which you may recall I descended from my colleague, Judge O'Scanlon? Well, in this particular case, the individuals — the two agents, one was a local police detective and one was a Federal agent, Agent Andrews, both were armed. In this case, there were — I thought only Uhaul was armed. No. Both were armed. The evidence at both the suppression hearing and the trial on that issue, Uhaul testified that Andrews was, in fact, armed and that her gun was visible to the public. Although I don't — I don't think Fuller indicated — expressly indicated in the suppression hearing that he saw Andrews' gun. He did expressly testify in the suppression hearing that he saw Uhaul's gun. I would say — That would go under the pressure to use to detain, the fifth element, right? Correct. Correct, yes. All right. So then how do you compare the duration of the detention in Bassignani and this one? Well, longer in Bassignani than this one. But I think the fact that they were armed also goes to the manner in which you summoned. If two police officers or agents of the State approach somebody and they're armed, I think that sets a sort of a different tone than if two agents or officers approach somebody and they're in civilian clothes and unarmed. How do you handle the statement that Andrews made after Fuller said, maybe I want an attorney, and she said, all a lawyer would do would be to tell you not to talk to us? Pretty straightforward advice, isn't it? Well, it — if it unfolded that way, what she was saying is probably true. If we had a lawyer, you wouldn't be talking to us. What more would a lawyer do than what Andrews did? Well, that's true. I mean, there is some truth to that. I don't — I don't know what a lawyer would have actually said had he come upon the scene. Well, any lawyer worth his salt would say don't talk to them. Well, probably so, yes. Back to the criteria of how he was summoned. Two versus one in terms — two agents, one suspect. They declined his offer, at least we would argue, to talk to them in the store cafe, which was much more open and public than the car. They decided to use the car. And this next point is very important. The way in which they directed him to and into the car I think is extremely important. Not only did they choose the venue in which the speech would take place or the interrogation would take place. I'm sorry. They — one flanked him from behind and one flanked him from the side. They walked him to the car. He stopped at the rear right door of the car. I believe Agent Andrews opened the door of the car while he stood there. She then — Now, this is an unmarked car, right? This is an unmarked car. It's not a black and white. Right. She walked around to the front driver's side and got in. As she was doing that, Mr. Fuller began to get in the car, which is what a person under a more relaxed situation would probably be doing. He was stopped by Detective Uhaul, and he stopped. He was told to stop, and he stopped. Once Agent Andrews got in the car and was settled and situated, he was directed to go ahead and sit down in the car by Uhaul. He went and sat down in the car, and he didn't close the car door. Uhaul closed the car door. So his activities all the way from the store to the car and getting in the car with the car door closing, those were all sort of micromanaged. And I think it set the tone at that point that they were in control of his movement. He wasn't in control of his own movement. Okay. He was confronted almost immediately with an allegation that, well, that he was they were investigating a child pornography case. He was also at some point, and we don't know exactly when this took place, he was also told that they had found a list of drugs and drug paraphernalia in his house. Well, he was also confronted with a couple of photographs, wasn't he? Almost immediately, correct. Right at the very beginning, according to Agent Andrews. The Judge Magistrate found nothing in the physical surroundings of the interrogation coercive. I would argue. Were you trial counsel in this case? No. I was the with respect to the environment in which the interrogation took place. Car had tinted windows, at least the side windows, and I'm not sure about the rear. Apparently the front did not. The car was facing the store. The windows were closed, according to my client, and that wasn't contradicted expressly by anybody. Detective Uhal sat close to Fuller in the back seat within 18 inches or so, rather than sitting at a more comfortable distance or more natural distance. And Fuller says he heard the car doors activate. Agent Uhal, you say, could have sat at a different distance? Either he sat next to him in the rear or he would sit in front of him. The distance seems to be about the same, right? Well, I guess the point I was trying to make is if this is, let's say, a midsize, I don't know how large this car is. And so I'm maybe arguing beyond the scope of the evidence in the case. But I think what Mr. Fuller was getting at when he talked about this in the suppression hearing is that it was an unnaturally close distance, given the environment in which they were located. In other words, he was saying Detective Uhal probably would have sat further away had they simply been sitting in the car and driving somewhere. And back to the doors activating, Fuller testified that he heard the door locks activate. And I think Agent Andrews did not expressly contradict his assertion that the doors were locked. I think she said something in an unequivocal way that she didn't normally do that. Judge Magistrate found that the agent exerted no coercion or hostility to prevent Fuller from leaving the interview. Back to the micromanagement of Fuller's movement, up to his getting in the car, I think set the atmosphere. You might want to get to the other points. Okay. All right. Next issue. What about the juror, number 47? Do you want to say something about that? Yes. All right. Let me jump right to the things that I think were at the heart of what this juror's true feelings must have been under the circumstances. We have an abuse of discretion standard of review here. Yes, you do. He said, manifest error as well. He said that a lot of things I can deal with, and this is not one. This is after he was asked whether he could view pornographic images, child pornographic images. He was told that he would probably be viewing these things during the trial. This is one. A lot of things I can deal with. This is not one of them. And not one of them sounds awfully unequivocal to me. I'm not sure I could do that. In other words, be fair and impartial. I'll do the best I can, which I would submit translates roughly into it will depend upon the evidence and how it affects me. Ergo, I don't know until I hear the evidence. I would be comfortable with a jury like me if I were innocent. Well, in a criminal trial, if a juror believes that a defendant is probably guilty, 51 percent guilty, but still, that juror is still held to the standard of proof beyond a reasonable doubt. And what can be inferred from that is if he thought he were guilty, that's where the analysis would end with him. He would have problems at that point being a fair and impartial juror. A lot of them. Well, Craighead is the strongest case. I'm sorry. I'm not Craighead. I'm sorry. For some reason, I did not include, I included all the cases I was going to distinguish. I did not include my principle thought. Well, do you want to distinguish Alexander? We upheld a district court's refusal to dismiss a juror for cause when the juror said she believed she could be fair and impartial, but never affirmatively said that she would be. How is that any different from this one? In this case, I think the difference probably lies in the fact that Juror No. 47 came right out and said there are a lot of things I can deal with, and this is not one.  I don't know that the statements made by the juror in the Alexander case were quite as unequivocal as that. But we don't stop there. We also look at how the judge tried to ferret out, you know, the bottom line in terms of the juror's ability to be fair. So we don't draw the line at the initial statement the juror makes. So how do you account for the questioning by the judge and the judge's determination that based on that, the juror could be fair and impartial? Well, what I would say is that the judge never got this juror to say, I know I can be fair and impartial. But then you're back to the Alexander case. Or even, I think I can. As far as the judge could go, the farthest the judge could get Juror No. 47 to go here was to say, I'll do the best I can. The juror never said, I will. I think I can do it. In the jury say, I believe I can? No. I don't believe so. I don't believe that was. I'll do the best I can as far as he went. It looks like I'm out of time. Your time has expired, counsel. Thank you. We'll hear from the government. May it please the Court. My name is Bruce Ferg, Assistant. Excuse me. I'm fighting a cold here. Assistant United States Attorney on behalf of the government in this case. Mr. Ferg. As was noted, there are essentially five issues before you. The discussion so far has been primarily about the suppression motion. I would suggest to you that the defendant obviously disagrees with the magistrate judge's factual conclusions and findings, but that isn't the basis for any kind of reversal or other remedy. He has to show that the magistrate clearly erred in the findings that she made. And if you actually analyze the findings, which I did in the pages of my brief, went through them one by one, and we find that she effectively found that all of the Kim-slash-Bastigliani factors militated in favor of the finding that there was no custody. First of all, how was he summoned? He was, she found, simply asked, requested to step outside. He was not ordered. He was simply asked in a public place. But Fuller preferred to go to the cafe. And I guess it was the agent or the police officer who said, well, that's not private enough. According to Mr. Fuller, he suggested that. The agents had no recollection of that, but in any event, even Mr. Fuller acknowledged she said, well, maybe the car would be more private, and he went along with it. There was no indication that he felt coerced at that point. Particularly, again, being asked in a public place. The whole issue of the guns being obvious has been raised, and Agent Andrews indicated that she had no recollection of actually having her gun on her person, because although she carried it holstered at the search scene, she thought that she may have put it into her purse by the time they went to the food market to meet with Mr. Fuller. They were both in uniform. No. They were both in plainclothes. Both in plainclothes. Yes, sir. And as a matter of fact, as counsel mentioned, even Mr. Fuller could not recall seeing a weapon on Agent Andrews. So it was simply on Detective Uhall, who, by the way, again, you're getting simply Mr. Fuller's spin on the facts, because as far as where was he seated, both Andrews and Uhall said he was actually allowed to sit in the front seat opposite Agent Andrews, and Uhall was in the back, separated from him by the seat arrangement. So here we have conflicting testimony. And ultimately, going through all of these five factors, was he confronted with the evidence? No, he was not. The Court's cases, which talk about confrontation, talk about a very aggressive,  Mr. Bassanetti was ordered into that conference room by his supervisor. Here that didn't occur, did it? That's correct. So, again, all the evidence is that it was completely free and voluntary. He was not attacked or told we have evidence, which, in fact, it did not. He was simply shown, hey, we're here to talk about this child pornography stuff. And he was shown the two particular screen views that had been taken during the week. But you consider that confrontation with evidence? They were his photographs, weren't they? Not in the way that the case lies. Pardon me. They were his photographs. They were taken from his computer. They were actually, it was his roommate's computer. I understand that. But the roommate said he had, Roger said he had nothing to do with this. So these two photographs were taken from Roger's computer used by Fuller and were used to show to Fuller in the car with the two agents. True? Yes. All right. So he was confronted with some evidence. He was shown evidence. And I don't mean to parse the words too much, but in the case law, the facts have been, again, a very aggressive kind of questioning, saying we know stuff about you. You don't lie to us. You've got to fess up, in effect. Not simply saying, you know, this is what we have to deal with. And they didn't even know who it belonged to because they had not yet done the forensic analysis. Didn't they accuse him, saying, aren't these your photographs? They described him as a person of interest because they didn't know. It was Mr. Roger's IP that they were actually tracking, his roommate. I understand that. But didn't the agents tell Fuller in the car that these photographs which they were cruising the Internet? I don't believe that they What did they just say? These are examples of what we see in our everyday prosecution of child pornography. Have you seen anything like this? I didn't say that. What? These are photographs we found on the computer. On the computer. But they did not say that they were ascribing them to him. They said we were here. Didn't they tell him they executed a search warrant at Roger's house? Yes. Come on. So what was the point of showing him the photos, then, in your view? Well, obviously, to see if he recognized them or would acknowledge them. But, again, whether a person is even a suspect is not the question because it's a purely objective analysis of whether an innocent person feels under the degree of constraint that goes with an arrest. But this factor is whether or not he was confronted with evidence. And it would be a little disingenuous to say that he was not being confronted with evidence. Well, I can understand Judge Bea's approach, but that's not the way I understand I'm sorry, Bea. But looking at the cases that I found that actually discussed what they found confrontational, it was not simply showing the person saying, here's evidence we have. What do you have to say about it? It was a basically bulldog attack kind of a real confrontation. Well, in Bassignani, it was found to be not confrontation when they said, we have to be honest with you, we found this stuff on your computer at home. All right? How is that different from this? We found that this was even stronger because they had a couple of examples. Well, to the extent in Bassignani they were specifically ascribing it to him, his computer, I don't think that kind of language was used here. You think they were ascribing it to Rogers? I don't think they ascribed it to anybody. I'd have to go back and review the exact testimony, but I think what my recollection of what Andrew said is simply we showed him the pictures that had been obtained during the undercover sessions. The pictures taken from the computer, right? There were actually two computers in the house, and they were networked. So once again, there isn't a kind of direct connection and direct confrontation that, again, was found in the case law. But again, physical surroundings. The court cases say that simply being in a police car, if you go there voluntarily, as the evidence was, is not itself sufficiently coercive. Now, as to the police car, the two agencies apparently, one was a Tucson Police Department detective. That's correct. Not in uniform. And the other was the FBI agent. That's correct. It's a task force, a multi-agency task force that was working this kind of cases. And so there were actually PCS, I'm sorry, Pima County Sheriff's Office and other personnel as well that were involved in the overall operation. But it was simply a matter of a typical task force where there are multiple agencies involved. Well, does the fact that they were from two separate agencies affect the intimidation factor at all in this situation? I would suggest not, particularly not in the way that it did in Craighead, because which seems to be kind of underlying some of this analysis. First of all, Craighead was specifically differentiated from other cases by the fact that it took place in the home and he had no place else to go, which is not the case here. But there also they're talking about, I think, 15 or 20 people in raid vests with AR-15s. It wasn't just a couple of plainclothes officers asking, can we talk to you? So it's a very different scenario. The duration was short, 15 to 30 minutes. And summing it all up, the magistrate found that the pressure used to detain the person, the kind of fifth catch-all factor, it simply wasn't there. That he had been asked, he agreed. She said that even if the doors were locked, which, again, was a point in dispute, she didn't make a specific finding, that it wasn't so as to affect the custody determination because Mr. Fuller could have gotten out any time he wanted to and was Andrews testified that she specifically told him, you can leave any time you want. He disputed that, but again, the evidence is there to support that this was essentially a noncoercive environment. He simply asked and simply told and then thought better of it afterwards. The second major issue is the retention of Juror 47. I think that we need to recognize that, yes, this is a situation where the voir dire of that juror is ambiguous. And that is the paradigm for why the Supreme Court in this Court has said that it defers to the unique ability, and that specific word has been used in this Court's cases in Claiborne, the unique ability of the trial court to discern whether or not the potential juror is biased or not. Even the language that we see here, which has been made so much of, actually what that juror was saying is, I have a problem with this subject matter. If you actually read whatever he said, there's no suggestion that he's saying, I'm thinking this guy is guilty. It's not there. He has problems with child porn subject matter because he is a grandfather with two young kids. And what do we find in the rest of the discussion that the district court had with him? First of all, yes. Kennedy. Counsel, could I interrupt you for a second? Did the defendant exhaust all his peremptory challenges? I honestly don't know. Since the Supreme Court has said that it's not necessary to do that in order to preserve a challenge for cause, I didn't actually check those numbers. Did you try this, Kennedy? No, sir. No, ma'am, I did not. But back to the record that we actually have in front of us. Juror 47 was asked and said that he presumed the defendant was innocent, and he was going to hold the government to its task of proving guilt beyond reasonable doubt. He recognized specifically that investigators sometimes get things wrong. This is not the verbiage of someone who is coming in predisposed to convict. When he was asked if he would be comfortable with himself as a juror, he said, well, if I was innocent, which is exactly what the defendant was presumed to be at that point. So he's giving what the district court considered to be a good answer. As a matter of fact, this is better than, for example, in a Nolte case where the juror started off saying, well, no, I don't really think I would want me as a juror on my case. And eventually in Nolte, because of the totality of the circumstances and the deference paid to the district court's fact-finding, this Court said it was not an abuse of discretion to keep that juror. Finally, he did repeatedly promise to work at being impartial. That's an important commitment. You're not just kind of going in there haphazard, but you're specifically telling the Court, I will do this. And finally, he swore to try the case impartially, which in Quintero-Brasa, this Court said was an important factor to take into the whole milieu of things. Now, those are the two issues that have been discussed so far. Obviously, there are three others. I can answer any questions that you have. But with regard to each of those, I pointed out in my brief that, again, they are deferential standards of review, and in none of those cases did the district court abuse its discretion in denying the mistrial motions and so forth. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Bea